and Security, et al. Mr. Toljan, for the appellate. Mr. Hendrick, for the immediate appellate.  Good morning, Chief Judge Garland. Nice seeing you again on this case, Judge Griffith. I guess the easiest place to begin is with a one-liner. You know, as the story is told about a family comes to hear the will read for their rich uncle, and the lawyer reads out, and to my nephew Harry, who wanted me to remember you in my will, hello Harry. And reading Judge Collier's treatment of Plato, that's how I felt. This court told her she needed to reconsider the case in light of the Plato factors. She said the word Plato. She said a few of the factors. She said these factors weigh in favor of an award of salatium damages, and she ended the discussion. There was no meat to it. A discussion of factors, as I'm sure your honors know better than I, requires a presentation of what are the facts that are relevant to this factor. Are they strong? Are they weak? Are they stronger or weaker than the way those factors are, or the way that factor is arrayed in other cases? Compare this case to some other situation and say this one weighs more heavily, this case weighs more lightly, and discuss the factors in an analysis that comes to a conclusion. Haven't we expressly rejected that line of reasoning that you just advanced? The idea that it's incumbent upon the district court to measure her determinations by the determinations made by other district court judges. No, I don't think you have, your honor. When we were here before, the argument was that the Heiser case, which had been relied on by so many and had incorporated so many cases that came before it, I tried to persuade you that it created a precedent, even though it wasn't from this court, it was from other district courts, but I said that Heiser was quasi-binding. And your honor said, no, it's not binding, and you said to the lower court that the court has to consider the issue of damages in light of the flato factors. Now, I will agree with you, your honor, there are ways that you can analyze damages in many cases without looking at prior cases. I'll give you a simple example. If you're talking about lost wages, you don't have to look and say somebody who lost a leg in a previous case, how much did he get for lost wages, and let's give the same amount here. For that, you can say he had lost wages, he made so much an hour, his work life expectancy was such and such, he was such and such years old, he would have expected so many raises. You can do a calculation. There's many kinds of damages, many kinds of factors that you can analyze in the abstract without reference to things that came before. But how do you take something like the emotional impact that losing your son had on you and analyze that in the abstract? There's no math that you can do, there's no table you can look at, there's no book you can look in other than looking at what did courts do with similar things in the past, or if it were a jury trial, you know, the jury looks at it in terms of the arguments that are made that are based on real life human analysis. The difference is that the jury doesn't have to explain how it got there, whereas the cases that we cite, ARPIN and the other cases, Eureka, say that a district court analyzing damages has to explain how it got there. It's not enough to say that here's five factors, 11 factors, seven factors, however many factors, and to recite that a few of them, quote, weigh in favor of salation damages, and then end the analysis at that. The court needed to go through how did she weigh those factors to come up with the number. It's not enough to say that this factor weighs in favor of salation damages, and on the facts of this case, I pick a number out of the air and give you X dollars, which happens to be an increase over what I gave you before when I considered impermissible factors, and I'm not even going to explain to you the analysis that I did to back out the impermissible factors. So, Judge Griffith, it's not binding, it's not precedent, but I don't know what else you could look at besides prior cases, prior jury verdicts. Outside of the court, if we were evaluating a case, we would look at jury verdict reporters, we would look at prior decisions, we'd look at sustained decisions on damages. That's what lawyers and judges and insurance companies, that's what people look at to assess the sustainable amount of damages for non-physical or non-accountable, you know, scientifically calculable damages in personal injury cases. My question, Mr. Tolchin, is your case strengthened or weakened by the striking similarity of the sequence of awards in other cases by district courts? And let me explain why I ask that. In one sense, it's very powerful that the awards gravitate around the points 5 million and 2.5 million for parents and for siblings, and it makes the award in this case look like more of an outlier and potentially more arbitrary, right? Yes. On the other hand, the very consistency of those awards may give each one of them less sort of gravitational mass in terms of representing a data point of reasoned analysis on the facts before those courts. If they seem to be just, well, we're just going to do what Dick Flanberth did, because as you acknowledge, it's very difficult to find real guideposts for this kind of analysis. And therefore, to some extent, don't we have to see what the district judge in this case did as sort of treating those as less than 60 odd data points and sort of as one? I have a few answers for that. The Heiser case was not the first case where those numbers came up. If you read the Heiser case, Judge Flanberth looked back at many other cases and tried to spot the trend, tried to see where those cases are going. I think he was motivated tremendously by the idea of fairness, that where the cases are not so distinguishable, they should be treated similarly, although his approach did involve the idea of upward and downward departures when cases were particularly egregious or the damages were particularly severe. For example, a case where somebody dies in a terror attack and is killed instantly versus one where somebody lingers, like the Woltz case where the deceased lingered for a month and the family had to go through that, the damages are different and that's dealt with with the idea of upward departures. I hear the question, and it's something that when I first got involved in these cases 15 years ago, I wondered about. I said, you know, gee, what Iran should do is they should come in and try one of these cases. In the cases we brought against non-governmental entities under the Anti-Terrorism Act, they said defendants should come in and try these cases and see if they can get a jury verdict to come in at lower numbers. And, you know, it happened. There was a case called Socolow in New York, which was a very large case. It was six or seven attacks. I had some involvement in it, although I didn't try the case. It went to verdict. It was ultimately on appeal dismissed for lack of jurisdiction under the Daimler at-home line of cases. But it went all the way to verdict in a full, heavily litigated adversarial trial. And wouldn't you know it, the jury's verdicts on the salation of damages were, they never heard of Heiser. They never heard of Judge Lamberth. All they heard was the arguments of counsel and the testimony of witnesses about what they experienced, and the jury's verdicts could have been copied out of Heiser. So when I saw that, I said, well, these cases do have validity. But still, as a matter of procedure, sure, Judge Collier didn't have to accept the numbers that Judge Lamberth and other cases recited in Heiser following the FLATO standard. But Judge Collier had to show how she got to the numbers that she picked. It is not enough just to say, because you deserve salation damages, I give you $1 million. It's not yours to just give. But amicus counsel goes through the FLATO factors in the brief, and they point to her evaluations of lingering versus non-lingering, brutal but not as brutal as it could have been. And recognizing this is a very surreal and tragic kind of analysis to even be. I mean, the comparative, there's something that feels very. Comparative horror. Very uncomfortable for anyone. But she does, you know, go down each of those factors and make some determination, relative determination. I commend amicus counsel for the way that they stitch together a little bit here and a little bit there. But it's not an accurate statement to say that Judge Collier conducted any analysis. She recited some facts. She repeated some facts in the setup of the analysis. What you would expect to see after that is a discussion of how she weighed the facts and how, what she credited, where did she get the number from? Why was it one number before and now it's a different number? And why does she insist on using the Gates case, which, okay, it's her personal favorite. She wrote it. It must have made, I'm sure it made a great impression on her because it was tried in front of her. But you couldn't think of a case, it's coincidentally also a foreign sovereign immunity state terrorism exception case. But you couldn't think of a case that was more dissimilar in terms of the facts of the case. There are so many other cases that are right on point. A teenage, a teenager killed in a bombing or an execution or a kidnapping. There's unfortunately dozens of cases like that. To compare, to take the Gates case, which was a military contractor working, a U.S. military contractor working in Iraq who was beheaded and say, okay, we're going to start with that case, but now I'm going to show you how completely different it is from this case. And then say, and therefore I'm giving a certain dollar amount without showing what the calculation is and without saying why, okay, she doesn't want to regard what other judges of her court have done as binding precedent, but why ignore them? Why start with your own case that's dissimilar and go through a long discussion of why it's dissimilar and why we have to give less here and completely ignore the other cases that have facts much more similar. How many cases would she have had to discuss? And wouldn't, if she discussed fewer than all the cases you identified, would she be accused of cherry picking? How many of the facts does she have to line up with the facts of this case? I think they come in groups. I mean, we tried in our brief to identify a handful of cases that really were very similar. On page 50 of our brief, Botvin, Roth, Thunebot, Woltz, Hirschfeld, Waxman. These are cases where the facts are similar, the age and stage of the plaintiff, the decedent is similar, the family is similar. In the Gates case, the surviving family were much older. He wasn't a teenager that was killed. It was an adult man working in Iraq as a military contractor. So even just the idea of how many years is this Salation Damages Award supposed to compensate you for, an older person has fewer years of life expectancy left. It's really comparing apples to oranges. Picking any of these other cases, the Hirschfeld case, it was a high school student who was killed in a terrorist attack when a gunman burst into a yeshiva in Jerusalem and killed a bunch of teenagers. The family was similar. Younger parents, younger siblings. It's on all fours with our case. The Waxman case, same thing. Botvin was killed in an explosion in a public mall in Jerusalem, also a teenager. These cases are so much similar. And I would respect if Judge Collier said, look, I looked at this, but I think that those damages were excessive and here's why. So I think Megas has also argued that where on your first appeal you put in your table and you linked it doctrinally to Heizer, on your second appeal you put in the same table and linked it doctrinally to Fletow. How is it related? You were making a similar argument to the prior panel and they did not rule in your favor on that issue. How do we see our way past that and respect the binding decision of a prior panel? I agree with you that the tables in the two appeals are virtually the same table, although I think there are some newer cases added in the second one. But the table just summarizes what happened in all the cases. The difference now is previously we gave you our pitch that what we called the Heizer standard is binding. That didn't fly. Your Honor said it's not binding. However, district courts have to follow Fletow. So even in Gates, Judge Collier didn't say she ignored Fletow, but she described it as being in disuse. After Frankel, now the only word from this court about what district courts are supposed to do when they assess damages in FSIA cases is this case. And after this case, the rule is look to Fletow. So the same table, Judge Collier, is relevant because it summarizes how all those different courts handled cases arising under the Fletow standard. I'm not saying it's binding, but it gives us information about what the court might have considered. And again, I can't emphasize this enough. If Judge Collier had followed some other method of analysis, that would be fine. She doesn't have to start with other cases and reason that this one is more, this one is less. But in the absence of any other form of weighing and balancing and discussion, what she did was picking a number out of the air. I would challenge amicus to, beyond just reciting some facts, find me one word in the decision that the district court wrote that could be described as analyzing those factors towards a calculation of damages that relies on something other than I know it when I see it. So every other case besides Gates and this case that's ever been has had substantially higher damages awards. For this family, for what they've been through, to be the theoretical example of, well, it's just the judge's discretion and she doesn't have to really tell you why. It's really, it lacks heart. And we're coming up in a couple of weeks on the fifth anniversary of Naftali Frankel's murder. And I hope I'll have good news for them. And with that, I'll rest on my brief. Good morning, your honors. Erica Hashimoto as court appointed amicus. And with me at council table are the three students who have been working on this case. Alison Dapper and Kyle Hendricks with the court's permission. Mr. Hendricks will be arguing this case. Yes. May it please the court. The Frankel family has suffered an unimaginable tragedy that continues to affect them to this day. The district court was faced with the extremely difficult task of quantifying this mental anguish. While another district court may have awarded a larger sum, the district court here did not abuse its discretion. Cured of the two impermissible factors, the district court used the flat-out mental anguish test as mandated by this court. This court previously held in the Frankel case that it is for this court to leave it to the wise discretion of the colleagues on the district court in coming to these extremely difficult... And did not conduct any analysis to say how that factor played out here. And he gave you a challenge. He said, I challenge my friend to identify instances where there was analysis that took place. Can you give us some instances where the district court analyzed the flat-out factor? Yes, Your Honor. The district court goes through each factor in depth, discussing all of the things that it found relevant to this. It goes through how the family suffered in not knowing whether their sibling and their child was dead or not. How they are affected to this day with PTSD and types of anxiety and seek help for those problems. But did she make a link between those factors and the amount of selenium damages? Yes, Your Honor. At the end of the opinion, the district court recognized that it had come to the award by taking into account all of the facts in this case used through the flat-out analysis. Well, that's a conclusion, but where's the analysis? Where did she say, because of this factor, the amount should be X? At no point in the opinion did the district court go through and say, factor one means that a certain number of damages should be awarded. But this test is overall looking at all of the relevant facts. And the other district court opinions are written in a fairly similar manner to this, where there aren't numbers given for each relevant factor. All of the factors are gone through, and as long as they are done in depth and looking at the entire record, the court uses its wise discretion to eventually come to an award. How do we limit that discretion? What if she had gone through all the flat-out factors and said, therefore, I think they should get $10? How would we review that under your argument? One of the things that causes an abuse of discretion is an erroneous assessment of the evidence. And if the number chosen is so wildly out of proportion to the analysis done, it clearly could be an abuse of discretion. But we don't see that here. This is a lower award than has been given in other cases, but it's not so wildly out of proportion. It's only $2 million less than the amount given in Gates, and there was still a substantial amount given, $8.5 million total. This case is lower, but it is not totally outside the stratosphere of what is standard, particularly considering that over two-thirds of these cases have been decided by just two judges who both used the Heiser formula. So the overall numbers are going to average far higher than they might have had several courts use different forms of calculation as this court did in its comparison to Gates. So in terms of reasoning, I think everybody recognizes, and our court rested its fair holding on the recognition that one district court's determination is not binding on another. But it also seems clear that, especially in an area like this, where there's so few guideposts, that once there's a body of decisions, that it becomes part of the fabric of what's relevant for decision-making, unless the court explains in some way why it shouldn't be. And one of the things that — I mean, there are many things that are difficult about this case, but the judge, in her reconsideration opinion before the appeal, directly took on other colleagues' decisions and said, I've already made it clear I'm not following those. I respect those other judges. And she says, it's true that my compensatory damage awards are inconsistent with those others. Yeah, they've used the framework. They've all kind of grouped around something. I'm doing something different. Does she, though, explain why? What's your sense, and what would you point us to, that explains why that's a non-arbitrary choice on her part? Well, I can't get into the district court's head, but it seems like she views that the numbers that have been given in other cases are too high. And through that, has given awards, Gates and this case, that are lower than the Heiser formula. And in that, the numbers may be lower, but we don't believe that she's required to look at the body of these other cases. This court previously held, in the Frankel case, that the court was not required to use the Heiser formula. It wasn't required to look at, generally, what is the standard for most district courts in coming to its award. It cited Gates as a place where a district court had declined to use Heiser. When you say use Heiser, are you talking about the end result numbers, or a methodology? And how do you see Heiser as different from Flay-Tao in terms of what they stand for, that's guidance for a district court? When I say use Heiser, I mean that there are baselines given in Heiser, 2.5 million for siblings, 5 million for parents. Just like their Appendix A. Yeah, and then go up and down based on specific facts. We read Flay-Tao to be very different than that, because it is simply several different considerations that are relevant for the court to look to in coming to its eventual award. The court goes through many different ones that some might be relevant in some cases and others in different cases. And this court required the district court to use those considerations in coming to an award. However, this court did not raise opinion to mandate that the numbers in Flay-Tao be used as a baseline in the way in which they would be used in the Heiser framework. It's about the way that the analysis is done as opposed to the numbers you need to begin with and then go up and down from. So under that understanding, it would be wholly reasonable for the district court to go through the Flay-Tao analysis and fully fulfill this court's mandate and still come to an award that is substantially lower than the amount that was given in Flay-Tao itself. So how can you say that when the court says you don't need to adhere to Heiser, meaning you don't need to do the same numbers, but if you're going to do some other project, wouldn't you think there would be a requirement to explain that? Yes, it would have been prudent for the court in this opinion to explain why it was choosing to use a number that was very different or that it simply thought the awards were too high. And in your view, did the court explain, or how close did the court come to explaining why? I mean, it talks about tort awards have to be based on their facts. The district court explained how it got to its award. It didn't explain why it may have had a thought about general awards being higher or lower than the general body of case law. But we don't believe that that was a necessary requirement for it not to abuse its discretion. The fact alone that it went through the Flay-Tao considerations as mandated by this court and came to an eventual award with a legitimate reasoning in and of itself seems to be enough to satisfy the discretion issue here. Okay, thank you. Is there time left? I'll give you another two minutes if you want. Your Honor, unless you have questions, I don't have much to add other than to point out two quick things in no particular order. One is just to emphasize, I neglected to mention before, that the district judge didn't even really go through Flay-Tao. She said, I'm not going to look at, there's Flay-Tao, and then there's this other case that condensed Flay-Tao, and I'll look at the other case. Flay-Tao, you know, it was the first, and it really represented, it really did what the district judge here should have done, which is say, how are we going to come up with numbers? Let's identify these factors, and let's weigh them, and let's evaluate them. If that's your gold standard, I mean, Flay-Tao doesn't, it talks generally about the problem and the details of the problem, but it doesn't do what you seem to be asking for here, which is really embroider each of the factors and then relate them to a number. It was struggling in a field where nobody had ever been there before. It was navigating across the Antarctic with no signposts, with no landmarks. It did the best it could in its situation, in its time. Subsequent courts have the benefit. You know, we say there's 60 cases. There's also cases from other districts. We just took the ones from the D.C., from the District of Columbia. But I repeat, there could be other ways to skin the cat, but you have to analyze based on some kind of signpost, some kind of analysis. And Judge Collard, I'm happy you referred to that reconsideration decision where Judge Collier actually said the court believes that difficult cases like this one require difficult and particular analyses of their facts and injuries. And she said that, and I'm looking for it. It's not here. Thank you. We'll take the matter under submission. Thank you.
judges: Garland, Griffith, Pillard